BARRY J. PORTMAN
Federal Public Defender
GEOFFREY A. HANSEN
Chief Assistant Federal Public Defender
19th Floor Federal Building – Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant RODGERS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-08-0716 SI |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| vs. | Sentencing: October 9, 2009 |
| RUFUS RODGERS, | |
| Defendant. | |

This case is set for sentencing on October 9, 2009, and involves the possession with the intent to sell a small amount of cocaine base to an undercover police officer. Because of this sale, the Government apparently will be asking that Mr. Rodgers be sentenced to a career offender sentence of 188 months in jail.[1] The Probation Officer recommends a downward variance from the otherwise applicable guideline range career, but nonetheless suggests that the Court impose a sentence of 144 months.

The defendant asks for a sentence of 60 months for the following reasons.

---

[1] In its opposition to the defendant's motion to continue the sentencing, the Government indicated that it would be asking for a career offender sentence.

1

**OVERVIEW**

This case arises from the "Helping Hands" program initiated by the Government in this district. In essence, the Government has decided to take cases where the defendant was originally charged in state court with selling a relatively small amount of crack and bring him or her to federal court for prosecution. This Court is intimately familiar with the nature of the program – once here, defendants are told that they may not litigate the case in any fashion (including bail motions, discovery motions, or motions to suppress evidence), under threat that if they do the Government will "file the prior," *i.e.* will give formal notice that the defendant has a prior qualifying conviction which in this case would have required the imposition of a 10 year mandatory minimum sentence. In exchange for quickly entering a plea and foregoing any effort to litigate the case, the defendant is offered the chance – *the chance* – to argue for a sentence at or near the mandatory minimum.

This is Mr. Rodgers's chance to convince the Court that a sentence of five years is appropriate.

**A. Nature of This Charge**

This Court is familiar with the facts of this case because it was the subject of extensive pretrial litigation. Essentially, Mr. Rodgers was standing in the Tenderloin when undercover police initiated a "buy-bust" involving another individual. While this bust was going forward, police officers claim they saw Mr. Rodgers selling some crack to an elderly woman. The police began to chase Mr. Rodgers up the street, and eventually tackled him from behind. A police officer placed a choke-hold on Mr. Rodgers, and he soon stopped breathing.[2] An ambulance was

---

[2] As this Court is aware from the defendant's filing re: prejudice resulting from the Government's Rule 16 violation, the police claimed that Mr. Rodgers passed out because he swallowed a number of the rocks of cocaine found in his possession, and that he experienced a crack "overdose." Had this case gone to trial, the defense was prepared to present expert testimony that the ingestion of rock cocaine would not have caused Mr. Rodgers to stop breathing in the manner described by the police, insofar as rock cocaine takes about 20-30 minutes to be absorbed into the body when it is swallowed. Rather, the defense expert would have testified that Mr. Rodgers lost consciousness in all likelihood because of the manner in

1  called, and Mr. Rodgers was taken to the hospital where he remained for the next few days.
2  Officers pinned a notice on him while he was comatose, telling him that he had only been
3  detained and not arrested.  As a result, Mr. Rodgers left the hospital when he awoke.

4  Mr. Rodgers later called the police in a effort to obtain the money which the police had
5  seized from him during his detention.  The police invited him to meet with them, and during that
6  meeting they asked him to help them in ongoing investigations.  Mr. Rodgers declined the offer,
7  but the police told him to think about it and let him leave even though there were two pending
8  warrants outstanding against Mr. Rodgers at that time.  He was later arrested in Berkeley on an
9  unrelated case, and the Government decided to prosecute him here for the Tenderloin drug
10 offense under the "Helping Hands" program.

**B.  Mr. Rodgers's Background**

12 Mr. Rodgers is a long-term drug addict.  He started using marijuana at 13, and has been
13 addicted to both cocaine and alcohol for much of his adult life.  He grew up without his real
14 father, and his step-father had little time for him.  By the age of 14, he was involved in the
15 criminal justice system, and he has struggled with both his substance addiction and legal
16 authorities since.

17 As one can see from reading the presentence report, Mr. Rodgers has two felony
18 convictions; one for assault, and one for drug sales.  Both of these priors, according to the PSR,
19 are qualifying priors for the career offender enhancement.

20 Before those convictions are discussed, the defendant would like to address the nature of
21 the allegations contained in the presentence report under the heading "Other Criminal Conduct."
22 For almost four pages[3], the PSR recounts somewhat inflammatory allegations made by police
23 about Mr. Rodgers which arose from incidents where Mr. Rodgers was *arrested* – *i.e.* he was

---

which the police applied the "Mastoid Technique," which is a form of choke-hold.

[3] Sadly, this section is twice as long as the sections describing Mr. Rodgers and his background.

3

1  never convicted of this conduct and has never been called upon to respond to the claims made
2  against him. The detail devoted to these unproved allegations is remarkable, and it puts Mr.
3  Rodgers in an unfortunate bind – if he decides to respond to these claims here and challenges the
4  truth of most or even some of these allegations, he fears that his sentencing will be devoted to
5  the resolution of matters which are essentially irrelevant to these proceedings. After all, there is
6  some very real merit to the line of authority which holds that when it comes to enhancements,
7  only those facts which a defendant admits are admissible as proof sufficient to support the
8  enhancement. *See Shepard v. United States*, 544 U.S. 13, 26 (2005). On the other hand, if he
9  does not respond, he fears the Court will regard as true all of those claims made by police
10 officers about Mr. Rodgers.

11 Mr. Rodgers merely asks this Court to consider the source of the information contained
12 in this section of the PSR, and to keep in mind that none of these claims have been independently
13 verified by the probation officer and thus are of no real value when determining what sentence to
14 impose in this case.

15 What this Court may consider, however, are Mr. Rodgers's priors convictions, and there
16 are two which create the basis for the Career Offender enhancement; his conviction nine years
17 ago for assault, and his conviction in 2004 for selling $20 worth of crack to an undercover police
18 officer.

19 As for the assault, Mr. Rodgers pleaded no contest to assaulting a man in 2000, and he
20 received probation with credit for 63 days in custody for that offense. Looking at the sentence
21 Mr. Rodgers received, the case, although serious, was apparently not as serious as the PSR
22 suggests. And importantly, it is now nine years old.

23 As for Mr. Rodgers's single drug conviction, the PSR indicates that Mr. Rodgers
24 introduced an undercover agent to two other individuals, who then sold $20 worth of crack to the
25 agent. Mr. Rodgers was not even personally involved in the sale of the drugs.

26

4

### C. The Guideline Calculations[4]

This Court is keenly aware that the issue about how to "guideline" crack sales is one of intense judicial and legislative interest. Legislation is before Congress to make the penalties and guidelines for crack and cocaine the same, and an increasing number of courts have decided to treat the two as equivalent even in the absence of such legislation. *See United States v. Gully*, 619 F.Supp.2d 633, 641-42 (N.D.Iowa 2009); *United States v. Lewis*, 623 F.Supp.2d 42 (D.D.C. 2009); *United States v. Owens,* 2009 WL 2485842 (W.D. Pa. Aug. 12, 2009); *United States v. Russell,* 2009 WL 2485734 (W.D. Pa. Aug. 12, 2009); *United States v. Carter*, 2009 WL 2578958 (W.D. Va. Aug. 18, 2009); *United States v. Luck,* 2009WL 2462192 (W.D. Va. Aug. 10, 2009). As those courts have noted, crack prosecutions and the sentencing guidelines applicable to those sales have disproportionately impacted African-American communities in this country, and the application of a 1 to 1 ratio is appropriate considering the arbitrary nature of the 100 to 1 ratio currently contained in the guidelines.

In addition, there is now widespread agreement not only in the Judiciary, but in the Department of Justice and the United States Sentencing Commission as well, that the disparity in penalties for crack and powder cocaine offenses is unwarranted, profoundly unfair, and has a severe disparate impact on African Americans. Speaking on behalf of the Judicial Conference of the United States, Judge Reggie B. Walton (D.D.C) noted that the Criminal Law Committee of the Conference had "concluded that this disparity between sentences was unsupportable, and undermined public confidence in the criminal justice system."[5] Relying on the conclusions of

---

[4] Many of these arguments are presented to this Court in another sentencing memorandum in the case of *United States v. Jessie Lewis,* No. 09 - 323 SI. Undersigned counsel apologizes for the overlap, but both cases are "Helping Hands" cases set for sentencing on the same day, and both involve many of the same issues.

[5] Statement of Judge Reggie B. Walton, United States District Court for the District of Columbia, before the Subcommittee on Crime and Drugs, Committee on the Judiciary, United States Senate, on "Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity," [hereinafter "Statement of Judge Walton"] at 1, April 29, 2009. (Available at: http://jnet.ao.dcn/Legislation/Cocaine_Sentencing/Judge_Reggie_B_Walton_testimony.html).

5

the U.S. Sentencing Commission, Judge Walton observed that the premises underlying the disparity between crack and powder cocaine penalties have proven to be false, and the disparity actually frustrates the goals of the Sentencing Reform Act.[6] Judge Walton in addition noted that some citizens today believe that federal statutes and the federal courts that enforce them have "racial underpinnings" because of the disparate impact of the crack penalties on African Americans.[7] Although African Americans comprise only 27 percent of federal cocaine powder offenders, they comprise 81.8 percent of the federal crack cocaine offenders.[8] Since the penalties for crack cocaine are so much more severe than for cocaine powder, this disparity has contributed significantly to the over-incarceration of African Americans and to the perception that our justice system is "influenced by racial considerations."[9]

Assistant Attorney General Lanny A. Breuer, testifying on behalf of the Department of Justice, echoed these concerns in his testimony before the Senate Judiciary Committee. He noted "that the current cocaine sentencing disparity is difficult to justify based on the facts and science, including evidence that crack is not an inherently more addictive substance than powder cocaine," and that [t]he impact of these [crack cocaine] laws has fueled the belief across the country that federal cocaine laws are unjust."[10] The Department of Justice, speaking for the

---

[6] *Id*. at 6 (citing U..S. Sentencing Comm'n, 2007 Report to the Congress: Cocaine and Federal Sentencing Policy (May 2007) [hereinafter U.S. Sentencing Comm'n, 2007 Report] at 8 ([T]he Commission maintains its consistently held position that the 100-to-1 drug quantity ratio significantly undermines the various congressional objectives set forth in the Sentencing Reform Act.")

[7] *Id.* at 7.

[8] *Id.* (citing U.S. Sentencing Comm'n, 2007 Report at 15).

[9] *Id.* at 8.

[10] Statement of Lanny A. Breuer, Assistant Attorney General, Criminal Division, United States Department of Justice, Before the United States Senate, Committee on the Judiciary, Subcommittee on Crime and Drugs, "Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity," at 9 (April 29, 2009) (Available at: http://judiciary.senate.gov/pdf/09-04-29BreuerTestimony.pdf ).

6

Administration of President Obama, has thus concluded that "Congress's goal should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine."[11]

Likewise, the U.S. Sentencing Commission, which is the institutional expert in the field of federal sentencing, has issued four reports over the last 14 years, all consistently concluding that the 100-to-1 crack/powder ratio is unwarranted, that the penalties for crack cocaine overstate the seriousness of the offense, and that the penalties have a severe disparate impact on minorities.[12]

Indeed, the experience in this district is no different, but rather proves the truth of these observations. As best as can be determined from our records, the office of the Federal Public Defender in San Francisco has handled 15 "Helping Hands" cases over the last six months. Of those, 12 of the defendants were African-American and three were Hispanic – not a single defendant represented by this office was white.

While the Government opposed the defendant's request to continue this sentencing until Congress has addressed this issue, it candidly conceded in its opposition what appears to be the current position of the Justice Department on this issue – that crack and cocaine should be treated the same for purposes of sentencing. *See* Gov. Opposition to Motion to Continue at 2 ("the Department of Justice believes that Congress and the Sentencing Commission should eliminate the crack cocaine/powder cocaine sentencing disparity").

The significance of this concession cannot be overemphasized. Because this case involves slightly more than 7 grams of crack cocaine, the Guidelines range currently applicable to this amount of crack, absent the Career Offender enhancement and with acceptance of

---

[11] *Id.* at 10.

[12] U.S. Sentencing Comm'n, 2007 Report at 8; *see also* United States Sentencing Commission [hereinafter USSC], 2002 Report to Congress: Cocaine and Federal Sentencing Policy (May 2002); USSC, 1997 Special Report to Congress: Cocaine and Federal Sentencing Policy (April 1997); USSC, 1995 Special Report to Congress: Cocaine and Federal Sentencing Policy (February 1995). These reports are available on the Sentencing Commission web site: www.ussc.gov

7

responsibility, is 77-96 months.[13] If Mr. Rodgers instead were being sentenced for the equivalent amount of cocaine powder, the range would be 24-30 months.[14]  More importantly, if Mr. Rodgers had been charged with selling powder cocaine, there would have been no mandatory minimum applicable to this sale, even if his prior had been alleged.  Again, this bears emphasis – if the law was today as the Government seemingly says it should be, then Mr. Rodgers faced no mandatory minimum for this case, and he could have freely litigated the matter without fear that he would face a 10 mandatory minimum brought on by a punitive decision to file the prior.

Of course, the Government's response is that none of this matters because Mr. Rodgers is a career offender.  There are three answers to this claim.

First, although probably not of tremendous consequence, the career offender guidelines change if crack and powder cocaine are treated the same.  As it presently stands, because Mr. Rodgers sold crack cocaine the maximum sentence he faces is 40 years.  Under USSG § 4B1.1(b), that means his career offender offense level is 34, and his guideline range (with acceptance) is 188-235.  If Mr. Rodgers had been charged for selling powder cocaine, the maximum sentence he would face was 20 years.  Under the career offender guidelines his offense level would have been 32, and his guideline range (with acceptance) would have been 151-188.

Second, and most importantly, the career offender guidelines are of course advisory, not mandatory, and the Court may vary from those guidelines. *See Kimbrough v. United States,*

---

[13] For quantities of crack cocaine of at least 5 grams, but less than 20 grams, the Base Offense Level is 24, under U.S.S.G. ¶ 2D1.1(c)(8). Mr. Rodgers is entitled to full credit for acceptance of responsibility under ¶ 3E1.1, resulting in a Total Offense Level 21.  Mr. Rodgers's criminal history point total is 13, establishing a Criminal History Category VI.  The resulting guideline range is 77- 96 months.

[14] For quantities of powder cocaine less than 25 grams, the Base Offense Level is 12, under U.S.S.G. ¶ 2D1.1(c)(14).  With full credit for acceptance of responsibility under ¶ 3E1.1, the result would be Total Offense Level 10.  Under Criminal History Category VI, the resulting guideline range would be 24 to 30 months.

8

128 S.Ct. 558 (2007).  Here, a defendant stands before the Court with a life-long history of drug addiction, and has but two felony convictions: one for selling $20 worth of crack and one for assault.  In both cases, Mr. Rodgers was originally sentenced to probation and county jail time.

Assuming that the crack cocaine/powder cocaine disparity is eliminated, Mr. Rodgers has now pleaded guilty to a crime that would have produced a guideline range of 24-30 months.  Yet despite these facts, the Government wants to jump his sentence to 188 months, a sentence almost *seven times* the guideline sentence he would face without the career offender enhancement.

As a matter of pure equity, this sentence is wrong.  The streets are full of addicts like Mr. Rodgers who cannot control their addiction, and who resort to petty drug dealing to support their own habit.  They are not big-time dealers who bring drugs in from other countries and who live a lavish lifestyle supported by their drug dealing.  These are folks, as has been the case with Mr. Rodgers, who live on the streets and who rent hotel rooms and share their drugs with other addicts and squeak by living one of the most pitiful forms of existence one can imagine.  That doesn't mean that they have the right to sell drugs, but it certainly doesn't mean that they deserve the harshest enhancement allowed under the guidelines either.

Third, there is a broader issue lurking in this case which no one should ignore.  The Government's "Helping Hand" program was established on the premise that the defendant would be provided with full discovery at or near his first appearance so that he could intelligently decide whether to plead guilty or litigate the case, knowing of course that if he did he would be subject to the enhanced mandatory minimum.  Here, based upon counsel's review of the evidence, Mr. Rodgers filed a motion to suppress evidence.  Only after the motion was filed and Mr. Rodgers was "hit with the prior" was he provided with declarations and discovery which rendered the motion legally meritless.  Morever, the discovery initially provided, when examined in light of counsel's independent investigation, suggested that the police had been less than candid Government counsel, and these facts suggested that there was a potential trial defense.  It

9

was only at the final pretrial hearing that the Government revealed that one of the San Francisco police officers had withheld facts which should have been disclosed under Rule 16 much earlier, facts which were crucial to the defendant's decision-making process about filing motions and proceeding to trial.  Based on this Rule 16 violation, the Court struck the prior for one week to return the parties to the status quo, and Mr. Rodgers immediately entered a plea.

What the facts of this case indicate is that the "Helping Hands" program is based upon a totally false premise – that the defendant is given enough information before he or she is called upon to plea so that the decision whether to litigate the case is truly knowing and voluntary.

In addition, it is counsel's opinion that the entire Helping Hands program has worked a real disservice to the criminal justice system, both federal and state.  The United States Attorney has made no effort to hide the purpose of his program –  to not only expedite pleas and dispositions in federal court, but to obtain sentences long enough to scare state defendants who are litigating their cases in state court and who are subject to the threat that their case will go federal if they continue to fight their case.  This program therefore not only chills the adversarial system in federal court, but it was specifically intended to do so in state court as well.  Indeed, undersigned counsel's office was recently told that some state prosecutors in San Francisco are now regularly telling state defendants that unless they plead at the arraignment on those state charges, the case will "go federal" under the Helping Hands program.

The question of course is what relevance this has to Mr. Rodgers's sentencing.  The answer lies in § 3553 and the overall purposes of sentencing.  This Court is acutely aware of the dangers associated with an institutionalized program which marginalizes the defense bar by severely punishing a client for trying to defend himself against the charges brought against him or her.  It is counsel's belief that the Helping Hands program was designed to do exactly that, insofar as state defendants who are clearly small-time drug dealers are being brought to federal court, where they face ten times the sentence they would normally face in state court.  The program is used for reasons other than punishing people like Rufus Rodgers, and to allow this

program to used to impose an *unjustifiably* long sentence to serve its own purposes would be tragic.

The question then is what is a *justifiable* sentence in this case. Again, holding the Government to its word that the crack and powder guidelines should be the same, it would not be unfair to sentence Mr. Rodgers to twice his otherwise applicable guideline range (24-30 months), *i.e.* 60 months. This sentence is fair because by doubling Mr. Rodgers's sentence, the Court punishes him for his past convictions, but does so in a manner which takes into account the minor nature of those past convictions, as well as the reality of what kind of person Mr. Rodgers happens to be and the reasons he is here before the Court. It is a severe sentence, but one which does not unduly punish him and which affords him some chance of getting out and making it in society. Finally, it is a sentence even the Government itself recognizes is *reasonable* in a case such as this. Specifically, the Government has a standard Helping Hands plea agreement which this Court is aware of from at least one other case before it. *See* Plea Agreement in *United States v. Jessie Lewis*, No. 09 - 323 SI. Had it not been for the unusual way this case unfolded and the Court's order returning the parties to the status quo for only a short while, there is no doubt that such an agreement would have been appropriate here.[15] In the Government Promises section in that plea agreement, the Government concedes that a "reasonable and appropriate sentence" would include a sentence of 60 months under the factors set forth in 18 U.S.C. § 3553.[16] That is the sentence which Mr. Rodgers asks that the Court impose in this case.

---

[15] Even if it had not been offered, Mr. Rodgers's case is certainly no more serious than is Mr. Lewis's case.

[16] In paragraph 14 of that plea agreement, the Government agrees that a "reasonable and appropriate" sentence is that set forth in paragraph 8 of the agreement, and paragraph 8 states that the sentence should be between 60 and 188 months. Thus, the Government may ask for a longer sentence in its sentencing memorandum in Mr. Lewis's case, but it has agreed in writing that a fair sentence would include a sentence of 60 months.

11

**CONCLUSION**

For all of the reasons set forth above, the defendant respectfully asks the Court to sentence Mr. Rodgers to 60 months in custody.

Dated: October 2, 2009

                         Respectfully submitted,

                         BARRY J. PORTMAN
                         Federal Public Defender

                           /S/

                         GEOFFREY A. HANSEN
                         Chief Assistant Federal Public Defender